# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Cause No. CR 25-106-GF-BMM** |
| Plaintiff, | |
| vs. | **ORDER ON MOTION TO SUPPRESS** |
| FREDERICK DOUGLAS HOBSON WOODS, II., | |
| Defendant. | |

## INTRODUCTION

A federal grand jury indicted Frederick Douglas Hobson Woods, II ("Woods") on one count of conspiracy with intent to distribute methamphetamine and fentanyl in violation of 18 U.S.C. §§ 841(a)(1) and 846, and one count of possession with intent to distribute fentanyl in violation of 21 U.S.C. § 841(a)(1). (Doc. 17.) Woods filed a motion to suppress all evidence seized from the allegedly unlawful traffic stop and detention of Woods, the K-9 sniff of the car, and the subsequently issued search warrant. (Doc. 52; Doc. 53 at 11.) The Government opposes the motion. (Doc. 67.) The Court held a hearing on the motion on April 22, 2026. (Doc. 71.)

1

## BACKGROUND

The Federal Tri-Agency Task Force ("TAFT") began investigating a suspected drug dealer in the Havre area, C.H. (Doc. 53 at 2.) TATF obtained reports that people were arriving from Spokane, Washington, to the Amtrak Station in Havre, Montana, to deliver fentanyl and methamphetamine to C.H. (*Id*. at 3.) TAFT agents observed that some of the people arriving from Spokane would stay at C.H.'s house. (*Id*.) TAFT agents received a tip that men had been selling drugs from C.H.'s home. (*Id*.) TAFT agents previously had conducted controlled purchases of fentanyl from C.H. in February 2025. (*Id*.) TAFT agents also had seized fentanyl from C.H. during a traffic stop in April 2025. (*Id*.) TAFT agents began focusing their investigation on those arriving from Spokane to Havre on the Amtrak based on this information. (*Id*.)

Amtrak Detective Erik Vanderfange notified TAFT agents that two Amtrak tickets had been purchased on August 20, 2025, for arrival from Spokane to Havre on August 21, 2025. (*Id*.) The purchase of the two tickets triggered the Amtrak "watchlist" because the two people had purchased the tickets under fictitious names. (*Id*.) Amtrak does not verify identification upon boarding the train, and TAFT agents reported that based on their experience, people frequently use aliases to purchase Amtrak tickets, especially when acting as drug couriers. (*Id*. at 4; Doc. 53-1 at 2.)

The buyers used the fictitious names of Kevin Smith and Todd Robinson to purchase the tickets in August of 2025. The credit card numbers associated with the tickets purchased revealed that the actual purchasers were Stepney Morris, who had an active Idaho parole-violation warrant, and Oliver Peroti, who had an active Washington parole-violation warrant. (*Id*. at 3-4.) Morris previously had purchased Amtrak tickets using a fictious name in July 2025 that investigations linked to suspected drug trafficking and C.H. (*Id*.) Washington law enforcement also suspected Peroti's involvement in a Spokane gas station shooting. (*Id*. at 4; Doc. 53-1.) TAFT agents later learned that Peroti's active warrant was not extraditable to Montana. (Doc. 53-4.)

The Federal agents, specifically TAFT agents and Montana Border Patrol Agents ("Agents"), investigating the drug distribution revolving around C.H., knew of a previous pick up from the Havre Amtrak station and drop off of unknown men to C.H.'s house. (*Id*.) Agents had reason to suspect that the men who arrived from Spokane were supplying C.H. with methamphetamine and fentanyl for drug distribution in the area. (*Id*.) A woman who previously had picked up and dropped off the two men later informed the Havre Police Department that she had picked up two unknown African American men from the Amtrak station upon C.H.'s request. (*Id*. at 2.)

The woman had dropped the two men at C.H.'s house. (*Id.*) The woman further reported that the two men were selling dangerous drugs from C.H.'s house, and she knew this fact because three of her friends had overdosed after having purchased drugs from the men. (*Id.*) Agents observed increased traffic at C.H.'s house, consistent with drug distribution, following the woman's report and following the arrival of the two unknown men. (*Id.*) The Amtrak tickets purchased by the unknown men in July 2025 also had been purchased using fictitious names. (*Id.*) The payment information confirmed that one of the tickets had been purchased by Morris in July 2025, the same person who again purchased Amtrak tickets in August 2025 to alert the "watchlist." (Doc. 53-3 at 2.)

Agents stationed themselves at the Havre Amtrak platform on August 21, 2025, awaiting arrival of the train from Spokane. (*Id.*) Agents observed two African American men exit the train carrying luggage. (*Id.*) Agents positively identified Peroti from comparison photographs. (*Id.*) Agents did not positively identify the second male who arrived with Peroti. (*Id.*) The photographs Agents had of Morris showed dreadlocks, whereas the male who exited the train was bald with a beard. (*Id.*) The second male who arrived with Peroti turned out to be Defendant Frederick Woods. (*Id.*)

Agents observed the two men, Peroti and Woods, greet a woman, later identified as M.C. at the Amtrak station. (*Id.* at 5.) Agents and Officers knew that

M.C. was a drug user. M.C., Peroti, and Woods got into a black 2013 Nissan Rogue ("Rogue") and departed the Amtrak station. (Doc. 53-2 at 2.) Agents followed the vehicle for several blocks and noted a "suspicious" route to C.H.'s home. (*Id*.) Agents noted that the Rouge was traveling a similar "suspicious" route as the previous time Agents had observed a woman pick up people from the Amtrak station and drop them at C.H.'s house on July 17, 2025. (Doc. 53-1 at 2-3.) The route taken by the woman and unknown men avoided the main roads of Havre and was believed to be "utilized to avoid law enforcement contact." (*Id*. at 3) Because Agents observed the Rogue traveling a similar route from the Amtrak station on August 21, 2025, Agents believed the Rogue was heading toward C.H.'s home and that the unknown men may be involved in drug distribution. (*Id*. at 5.)

Agents observed that the Rogue soon would enter a school zone. (*Id*.) Agents wanted to avoid a potentially tense and dangerous stop within the school zone due to Peroti's known criminal history and recent alleged involvement in a shooting. (*Id*.) Havre Police Sergeant Justin Gomke and Captain Ryan Pearson ("Officers") initiated a traffic stop on the Rogue at the direction of Agents. (Doc. 53-1 at 3.) Officers had their firearms drawn and ordered the Rogue occupants to exit the car. (*Id*.) Officers removed M.C., Peroti, and Woods and identified the Rogue occupants. (*Id*.) Officers detained M.C., Peroti, and Woods during the duration of the stop. (*Id*.)

Officers briefly interviewed M.C. during the stop. (*Id.*) M.C. informed Officers that she was unfamiliar with the two men she had picked up, and that she was asked by C.H. to pick up the "a friend" at the Amtrak station. (*Id.*) M.C. denied that any of the luggage in the Rogue belonged to her. (*Id.*) Officers also determined that Peroti's warrant was not extraditable to Montana after having stopped the Rogue. (*Id.*) Officers summoned K-9 "Mia" to conduct an open-air sniff around the Rogue. (*Id.*) K-9 Mia alerted to the passenger side back door. (*Id.*) Officers seized the Rogue pending a search warrant. (*Id.*)

Agent Jayce Barclay applied for and was granted a search warrant of the Rogue by a Montana state district judge on August 21, 2025. (*Id.*) Agent Barclay's affidavit included the following information to establish probable cause: (1) the prior controlled buy and car search of C.H.; (2) the information pertaining to the theory of drug delivery on the Amtrak from Spokane to Havre and the Amtrak "watchlist;" (3) the Amtrak ticket purchases linking Peroti and Morris using fictious names; (4) Peroti's parole-violation warrant and alleged shooting involvement; (5) the GPS tracker put on Peroti's phone by Spokane Police Detectives showing that Peroti's location was in Chester, Montana, consistent with the Amtrak travel; (6) the previous information regarding drug distribution from a person who had picked up two African American men from the Havre Amtrak station and dropped them off to C.H.'s house upon arrival; (7) Agents positive

identification of Peroti exiting the Amtrak train; (8) the suspicious and similar travel route taken from the Amtrak station to C.H.'s house; (9) M.C. statements following the stop and information about the luggage belonging to Peroti and Woods; (10) K-9 Mia's alert; and (11) Woods's and Peroti's criminal history search showing arrests for Manufacturing/Delivering/Possessing controlled substances out of Washington. (Doc. 53-6 at 6-9.) A subsequent search of the Rogue revealed firearms, methamphetamine and fentanyl, multiple cell phones, a laptop, and digital scale. (Doc. 53 at 6.)

## LEGAL STANDARD

The Fourth Amendment guarantees the right to be free from unreasonable search and seizure. U.S. Cont. Amend. IV. The Fourth Amendment's "overriding function" protects personal privacy and dignity against unwarranted intrusion by the State. *Schmerber v. California*, 384 U.S. 757, 767 (1966).

A vehicle stop represents a "seizure" under the Fourth Amendment. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). Generally, the Fourth Amendment requires probable cause to support a seizure, but the *Terry* investigative stop provides an exception to the probable-cause rule. *Terry*, 392 U.S. at 21. A *Terry* stop authorizes law enforcement officers to briefly detain a person for investigative purposes based on a "reasonable suspicion supported by articulable facts that criminal activity may be afoot." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Courts must look at the

totality of the circumstances in determining whether the officers had reasonable and particularized suspicion to make the *Terry* stop. *United States v. Arvizo*, 534 U.S. 266, 273 (2002).

## DISCUSSION

### I.  Whether the traffic stop conducted on the Rogue was supported by Particularized Reasonable Suspicion

The particularized reasonable suspicion requirement encompasses two elements. *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (citing *United States v. Cortez*, 449 U.S. 411, 418 (1981)). Courts first must assess whether reasonable suspicion existed based on the totality of the circumstances. *Id*. Second, courts must assess whether officers had a reasonable suspicion that the *particular person being stopped* has committed or is about to commit a crime. *Montero-Camargo*, 208 F.3d at 1129 (emphasis in original). The Court will address each element below.

### a.  Reasonable Suspicion

Woods argues that Agents lacked reasonable suspicion to stop the Rogue because Agents and Officers impermissibly relied only on vague descriptions of "black males traveling from Spokane." (Doc. 53 at 8.) Woods argues that Agents' reliance on Woods's and Peroti's race and travel pattern remain impermissible factors to amount to reasonable suspicion. (Doc. 53 at 10 (citing *Montero-Camargo*, 208 F. 3d at 1134-35).)

Reasonable suspicion means that officers have a "particular and objective basis for suspecting legal wrongdoing." *United States v. Garcia*, 2017 U.S. Dist. LEXIS 116407, at *6 (9th Cir. 2017). Reasonable suspicion represents a not particularly high bar. *Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013). Officers must have more than a mere hunch that criminal activity may be occurring to justify the stop. *Terry*, 392 U.S. at 27. Arriving at a train station with luggage seemingly may not appear as criminal behavior. "[C]onduct that may not necessarily be indicative of criminal activity may, in certain circumstances, be relevant to the reasonable suspicion calculus." *Montero-Camargo*, 208 F.3d 1130. Agents had a reasonable suspicion that criminal activity was afoot when Peroti and Woods arrived at the Amtrak station under these particular circumstances.

Agents had received reliable information linking drug distribution in the Havre area, specifically involving C.H., to people arriving from Spokane on the Amtrak. The tickets purchased on August 20, 2025, for travel from Spokane, Washington to Havre alerted the "watchlist" which confirmed that the travelers had purchased the Amtrak tickets under fictitious names. The Amtrak detective linked the tickets purchased to Morris and Peroti, both African American males from Washington who had active arrest warrants. Agents' investigations into the drug trafficking in the Havre area previously had linked Morris to an Amtrak ticket purchased in July 2025. This previous purchase by Morris and arrival of two people

proved connected to the sale of dangerous drugs from C.H.'s house. Agents had information on C.H.'s distribution of drugs in the area as her house had been under surveillance, Agents had conducted a controlled buy, and Agents had found C.H. in possession of fentanyl on another occasion.

Agents knew from information received from the Amtrak detective that only two people were traveling from Spokane to Havre on the August 21, 2025, train. The people had purchased the tickets under fictious names. One of the tickets had been purchased by Morris, who Agents and Officers linked to a previous arrival to Havre on the Amtrak where men began distributing dangerous drugs from C.H.'s home. Peroti purchased the other ticket and had an active warrant from Washington.

Agents then observed two men arrive to Havre on the Amtrak as anticipated on August 21, 2025. Agents observed the two men exit the train together carrying luggage. Agents positively identified Peroti upon his arrival at the Amtrak station in Havre. The positive identification of Peroti triggered Agents to follow the Rogue consistent with their drug distribution suspicions. The two men both entered the Rogue and began traveling in the direction of C.H.'s home and in a similar route taken for the July 2025 trip connected to drug distribution from C.H.'s house. Based on the above information and the ongoing investigation into C.H., Agents reasonably believed that these men arriving on the Amtrak from Spokane could be the source of drug supply for C.H.'s drug distribution in Havre. (Doc. 53-3 at 3.) Agents and

10

Officers had particular and objective facts linking Peroti and Woods to drug activity, not merely a hunch that criminal activity was occurring. *Terry*, 392 U.S. at 27.

Agents' reasonable suspicion of criminal activity also proved supported by the information and similarities they had obtained from the woman who previously had been asked by C.H. to pick up two unknown men from the Amtrak station. This woman informed the Havre Police Department that the men she picked up and dropped off at C.H.'s house were selling dangerous drugs. Similarly to this previous pick-up and drop-off to C.H.'s house, Agents also observed the driver of the Rogue taking a similar suspicious and indirect route toward C.H.'s home. Agents linked one of the tickets purchased in July to Morris and again linked another ticket purchase to Morris on this August 2025 trip. Agents and Officers reasonably inferred from the facts before them that the two men who arrived at the Amtrak station appeared that they may be involved in criminal and drug activity involving C.H. Agents also positively identified one of the men, specifically, Peroti who had an active warrant for his arrest. Agents did not rely solely on the vague description of two African Americans arriving on the Amtrak to form the basis of their reasonable suspicion. Agents had objective and particular facts to allow a reasonable officer to suspect criminal activity and perform a brief stop on the Rogue under the totality of the circumstances.

a. **Reasonable suspicion of particular person being stopped**

11

Woods also argues that the information on which Agents and Officers relied for the traffic stop did not pertain to Woods to allow a stop and detention of Woods. (Doc. 53.) The Court disagrees. Woods remains correct that reasonable suspicion cannot be based on "broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the *particular person* to be stopped." *United States v. Rodriguez-Sanchez*, 23 F.3d 1488, 1492 (9th Cir. 1994) (emphasis added). The Court acknowledges that a traffic stop, without a positive identification of Peroti, potentially would have been troublesome had Agents stopped a car solely because two African American men had arrived on the Amtrak train from Washington.

The circumstances here indicate that Agents had objective and specific facts tying Peroti to criminal activity beyond just his general appearance of being an African American male. Agents had reasonable suspicion to stop the car Peroti was traveling in because Peroti matched the exact identification that Agents expected to arrive on the Amtrak train and Peroti's and Woods's actions remained consistent with the July 2025 trip where men arrived in Havre and began selling dangerous drugs from C.H.'s house. Peroti had purchased his Amtrak ticket under a fictitious name, alerting the "watchlist" and was tied to a shooting in Washington. The Court rejects Wood's contention that the stop of the Rogue was not premised on an impermissibly broad generalization of "black males arriving from Spokane."

12

Agents instead had an individual, positive identification of Peroti when he arrived at the Amtrak station in Havre. Peroti's purchase of the tickets under a fictitious name and matching the description upon arrival gave Agents a reasonable basis to believe Peroti, and as an extension, Woods, were engaged in criminal activity. In *Maryland v. Wilson*, 519 U.S. 408, 413 (1997), the U.S. Supreme Court explained that law enforcement officers "may order passengers to get out of the car pending completion of the stop." *Wilson* held that a proper stop of a car allowed law enforcement officers to demand even the passengers to exit the car for officer safety. *Id*. at 412-413. Even if Agents and Officers had not positively identified Woods, the valid stop of the Rogue where Peroti was located allowed Officers to demand that Woods also exit the Rogue for Officer safety and to dispel their reasonable suspicions.

Agents had specific information targeted at Peroti that tied him to suspected wrongdoing, drug activity, and an active warrant. Agents observed that the Rogue likely was traveling to C.H.'s house based on previous trips by those selling dangerous drugs from the Amtrak station to C.H.'s house. Woods did not match the identification Agents had of Morris. Woods arrived with Peroti, however, who was positively identified as the passenger who had purchased the "watchlist" ticket. Woods and Peroti also both arrived at the Amtrak station together, got into the Rogue together, and began traveling toward and in a similar "suspicious" route to C.H.'s

house. Agents and Officers also had reasonable information that Peroti had an active warrant to justify the stop. Officers later discovered that Peroti's warrant was not extraditable.

Woods relies on *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979), and *United States v. Di Re*, 332 U.S. 581, 587 (1948) (superseded by statute for other grounds), to argue that the stop of Peroti did not permit a sweeping detention of all the occupants in the vehicle. (Doc. 53 at 9.) *Ybarra* held that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." 444 U.S. at 91. The Court notes, however, that Agents only needed reasonable suspicion to stop the Rogue. The subsequent interview with M.C. and the K-9 alert developed probable cause against Woods who Agents observed to be carrying luggage from the Amtrak station that was located within the Rogue when K-9 Mia alerted.

Additionally, in *Di Re* the court found that an individual's person could not be searched just because of their "mere presence in a suspected car." 332 U.S. at 587. Unlike *Di Re,* Woods does not present evidence that Officers unlawfully searched his person following the valid stop of the Rogue. Officers briefly detained Woods following the stop and performed a pat down for weapons. (Doc. 53-3 at 4.) Officers did not exceed the stop by searching Woods's person without probable cause just because he was in the same vehicle as Peroti. Agents and Officers had a reasonable

14

basis for suspecting wrongdoing of Woods and Peroti under the totality of the circumstances. Agents and Officers had reasonable suspicion to warrant conducting a *Terry* stop on the Rogue.

## II.   Whether Officers lawfully prolonged the stop by deploying a K-9 sniff of the Rogue

An officer who executes a valid stop "may detain [the suspect] for a reasonable period of time." *Garcia*, 2017 U.S. Dist. LEXIS 116407 * at 7 (quoting *United States v. Martinez*, 403 Fed. App'x 182, 183 (9th Cir. 2010)) (citations omitted). An officer's deployment of K-9 Mia proves permissible if it is "supported by independent reasonable suspicion" or part of the law enforcement officers' mission of the stop. *United States v. Smith*, 2025 U.S. Dist. LEXIS 211477, at *11 (D. Mont. 2025).

Woods argues that "the record shows no new facts arose before the dog sniff" to develop an independent reasonable suspicion to allow for the K-9 sniff or prolonged detention of M.C., Woods, and Peroti. (Doc. 53 at 10.) The Government contends that Agents and Officers performed the stop based on suspicion of drug trafficking not based on a traffic violation. (Doc. 67 at 12-13.) The Government argues that the deployment of K-9 Mia fell within the core mission of the stop to investigate the presence of drugs. (*Id*. at 13.)

Officers' decision to prolong the traffic stop and deploy K-9 Mia proves legally justified as drug detection remained the mission of the stop and Officers

15

gained independent information to suspect drugs were present in the Rogue. Officers conducted a valid stop on the Rogue in order to dispel their suspicions that Peroti and Woods had arrived to distribute drugs from C.H.'s home. The mission of the stop, to detect drugs, allowed Officers to deploy K-9 Mia to confirm or dispel these suspicions.

Officers also had developed independent reasonable suspicion that the Rogue may contain dangerous drugs based on M.C.'s brief interview with Officers. M.C. indicated that she did not know either Woods or Peroti, and that C.H. had asked her to pick up and drop off the two men at C.H.'s house. M.C. reported that Woods and Peroti placed the luggage in the Rogue and that none of the luggage belonged to her. This new information received from M.C. provided Officers with the requisite information that Woods and Peroti were traveling to C.H.'s home and likely arrived to supply drugs based on Officers' known information about C.H.'s drug distribution in the area and the previous July 2025 trip.

Officers decided to deploy K-9 Mia to conduct an open-air sniff of the Rogue based on their mission to detect drugs, observations, and independent information provided by M.C. following the initial stop. Based on these independent bases, Officers reasonably suspected that the Rogue may contain contraband. K-9 Mia alerted to the passenger side back door of the Rogue. Officers' decision to prolong the traffic stop and deploy K-9 Mia remained part of Officers mission of the stop

and supported by independent reasonable suspicion under the totality of the circumstances.

## III.    The Search Warrant

The Court has determined that the initial traffic stop on the Rogue was lawful and not unreasonably prolonged. The Court must now decide whether the search warrant was supported by probable cause.

Probable cause in the context of a search warrant requires that there exists "only a 'fair probability,' not certainty" that contraband or evidence will likely be found in the place to be searched. *United States v. Hill*, 459 F.3d 966, 970 (9th Cir. 2006); *United States v. Mendonsa*, 989 F.2d 366, 368 (9th Cir. 1993). The affidavit must provide a neutral magistrate the opportunity to "make a common sense determination" that contraband or evidence will likely be found. *Mendosa*, 989 F. 2d at 368. "[A] finding of probable cause will be upheld so long as there is a 'substantial basis' for concluding that the supporting affidavit established probable cause." *Smith*, 2025 U.S. Dist. LEXIS 211477, at *14-15 (citing *United States v. Clark*, 31 F.3d 831, 834 (9th Cir. 1994)).

Agent Jayce Barclay's affidavit outlined the following facts to support a finding of probable cause: (1) the prior controlled buy and car search of C.H.; (2) the information pertaining to the theory of drug delivery on the Amtrak from Spokane to Havre and the Amtrak "watchlist;" (3) the Amtrak ticket purchases

17

linking Peroti and Morris using fictious names; (4) Peroti's parole-violation warrant and alleged shooting involvement; (5) the GPS tracker put on Peroti's phone by Spokane Police Detectives showing that Peroti's location was in Chester, Montana, consistent with the Amtrak travel; (6) the previous information related to drug distribution from a person who had picked up two African American men from the Havre Amtrak station and dropped them off to C.H.'s house upon arrival; (7) Agents' positive identification of Peroti exiting the Amtrak train; (8) the suspicious and similar travel route taken from the Amtrak station to C.H.'s house; (9) M.C. statements following the stop relating to C.H. and the information about the luggage belonging to Peroti and Woods; (10) K-9 Mia's alert; and (11) Woods's and Peroti's criminal history search showing arrests for Manufacturing/Delivering/Possessing controlled substances out of Washington. (Doc. 53-6 at 6-9.)

Based on this information, a neutral magistrate could and did make a commonsense determination that contraband and evidence of criminal activity probably existed in the Rogue. The search warrant's affidavit put forth a substantial basis that established probable cause. *Smith*, 2025 U.S. Dist. LEXIS 211477, at *14-15. The Court declines to overturn such a finding by the neutral magistrate.

## CONCLUSION

Officers had particularized, reasonable suspicion to conduct the initial stop of the Rogue. The Court denies Woods's motion to suppress the evidence seized from the traffic stop, K-9 sniff, and subsequent search of the Rogue.

## ORDER

Accordingly, **IT IS ORDERED** that Woods's Motion to Suppress (Doc. 52) is **DENIED.**

DATED this 22nd day of June 2026.

_____
Brian Morris, Chief District Judge
United States District Court